THE PEOPLE *ex rel.* THE DEPARTMENT OF LABOR, Plaintiff-Appellant,
v. GENERAL ELECTRIC COMPANY, Defendant-Appellee.

First District (2nd Division)    No. 1—02—3372

Opinion filed March 9, 2004.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Jerald S. Post, Assistant Attorney General, of counsel), for appellant.

Seyfarth Shaw, of Chicago (David J. Rowland and Noah A. Finkel, of counsel), for appellee.

JUSTICE BURKE delivered the opinion of the court:

Plaintiff, the People of the State of Illinois *ex rel.* the Illinois Department of Labor (Department) appeals from an order of the circuit court entering summary judgment in favor of defendant General Electric Company, concluding that two former General Electric employees were not entitled to additional pay for vacation time. On appeal, the Department contends that General Electric was not entitled to summary judgment because it failed to demonstrate that its practice of precluding employees from taking vacation days during the first year of employment was not a subterfuge to avoid making payment to its employees for vacation days earned. For the reasons set forth below, we reverse and remand.

## STATEMENT OF FACTS

Ronald Hogue worked for General Electric from August 12, 1961, until August 1, 1998, when he retired. At this time, Hogue was entitled to 30 days' vacation, he had taken 12 days, and General Electric paid him for 18 days, the unused portion of his allotted vacation time. Hogue believed, however, that he was entitled to $7/12$ additional time for the period he worked in 1998. Priscilla Scott worked for General Electric from March 1, 1973, until November 30, 1999, when she retired. At this time, Scott was entitled to 25 days' vacation, but she had taken all 25 days prior to her retirement. Scott believed, however, that she was entitled to $11/12$ additional time for the period she worked in 1999. Both Hogue and Scott worked at General Electric's Morrison, Illinois, plant.

On July 30, 1999, the Department issued a wage payment demand to General Electric, with respect to Hogue, seeking payment for vacation time during the seven months he worked in 1998, in the amount of $2,187.50. Because General Electric did not pay this amount, on July 13, 2000, the Department filed a complaint against General Electric, alleging that General Electric violated section 5 of the Wage Payment and Collection Act (820 ILCS 115/5 (West 2002)) by refusing to pay Hogue for the additional vacation time. On December 29, the Department issued a wage payment demand to General Electric on

behalf of Scott in the amount of $3,244 for vacation time for the period she worked in 1999. Because General Electric refused to pay Scott the additional amount, the Department amended its complaint on July 6, 2001, to add a claim on her behalf. In both complaints, the Department sought the amount due and owing Hogue and Scott, as well as penalties as provided for by statute.

On February 14, 2002, General Electric filed a motion for summary judgment. Attached to the motion was the "Declaration of James Shires," in which Shires stated that he was the human resource manager for General Electric at the Morrison plant from June 1998 to April 2000. According to him, a vacation policy was in effect from January 1, 1995, to January 1, 1998, and another in effect from January 1, 1998, until January 1, 2001. Both of these policies, contained in General Electric's employee handbooks, were attached to General Electric's motion for summary judgment. Shires declared that, although the language of the two policies was different, they meant the same thing and were administered in the same way. Shires further declared that employees were not entitled to and did not earn vacation benefits until after one year of service. Once an employee completed the one year of service, he or she was awarded all of that year's vacation time in advance on January 1. Shires also declared that if there was a gap between an employee's first anniversary and January 1, the employee was awarded one week's vacation during that gap period. Shires further acknowledged that employees received additional vacation time based on their length of service.[1]

Also attached to General Electric's motion were the deposition transcripts of Shires and Harold Wickler, General Electric's human

---

[1]Although the Department did not object to the propriety of Shires' "Declaration" at the trial level, and would therefore have waived any challenge to it on appeal (*Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 623, 663 N.E.2d 1 (1995)), we nonetheless briefly note that this is not a proper affidavit—it is not titled as such and does not comply with the requirements of Supreme Court Rule 191. 145 Ill. 2d R. 191. It is not sworn to or under oath, nor does it appear that Shires took an oath at all before drafting the averments therein—a requirement of Rule 191. See *Robidoux v. Oliphant*, 201 Ill. 2d 324, 340, 343, 775 N.E.2d 987 (2002). See also *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 495, 782 N.E.2d 212 (2002) (noting that *Robidoux*'s analysis applied only to Rule 191 affidavits, which rule applies only to specific proceedings, including summary judgment). There is nothing in the summary judgment rules relating to "declarations." Rather, the rules discuss pleadings, admissions, depositions, and affidavits. This "Declaration" falls under none of these. A law firm as large as defense counsel's should well be aware of the law and requirements of proper attach-

resource specialist, as well as excerpts from Hogue's and Scott's depositions. Hogue testified that it was his understanding, from reading the employee handbooks, that employees worked one year to earn vacation for the next year. Hogue admitted that, over the years, a lot of his friends retired and did not get paid for the next year's vacation time. However, Hogue stated that he did not think about this until he retired and, after he learned the law in Illinois, he came to believe this policy was wrong.

Priscilla Scott testified that when she was hired in 1973, Bud Claven of General Electric's human resource department told her that employees worked one year for the next year's vacation. Scott further stated that, over the years, she had general conversations with over 100 people who had talked about how employees worked that year to get vacation time next year. Scott admitted that she never read the vacation policy in General Electric's employee handbooks until she retired.

James Shires testified that he was the human resource manager for General Electric's Morrison plant from June 1998 to May 2000. At the time of his deposition, he was a vice president of human resources. According to Shires, in both positions he did the same work: administered personnel policies, including vacation policies. When asked how the terms "earned" and "eligible" differed, Shires stated that he could not say and that he did not use the term "earn."[2] With respect to General Electric's vacation policy, Shires stated that as of January 1 each year, any employee who received income in the last week of the previous year was eligible to take all of his or her vacation days immediately. However, an employee who was going to pass an anniversary date that year would have to await that date to take the additional time. The following colloquy then occurred between the Department's attorney and Shires:

"Q. [Ms. Nguyen:] Is it your understanding for the first six months that you worked there at General Electric, were you earning vacation?

A. No.

Q. You simply became eligible after six months to take vacation?

A. Yes.

Q. When would you start earning that one-week vacation that you say that you're eligible for after six months?

---

ments to motions for summary judgment. We note that counsel attached the same type of document to its reply in support of its motion for summary judgment. Thus, counsel has not only one time, but twice, failed to comply with Rule 191.

[2]This contradicts Shires' statement in his "Declaration" that is set forth above.

* * *

A. I don't know that I'd ever say—I would never say that I was earning some vacation. I would say when I would be able to take vacation."[3]

Harold Wickler testified that "eligible" meant that an employee was actively on the payroll in January of each year. According to Wickler, an employee needed one year of continuous service to become eligible for vacation time. Wickler stated that if someone worked continuously through December 31, and retired that day, he or she would be eligible for the next year's vacation allotment. Wickler then testified as follows as to the meaning of "earn" and "eligibility":

"When you earn something, you have done something, and after you have done that, you get a reward. At the end of a week, you get paid. You've earned it, therefore you get paid.

* * *

And eligible, you have met certain requirements but you have to be within certain parameters to be eligible."

Wickler further testified, in response to the Department's attorney's questions, as follows:

"Q. [Ms. Nguyen:] In the years with General Electric and in your position as a human resource specialist, were you ever told that your vacation that you're allotted at the beginning of the year is an inducement for future services?

A. No.

Q. That term was never used?

A. Never used.

Q. Were you ever told that on January 1st all the vacation that you were allotted was vacation that was advanced to you?

A. No."

Wickler, when later questioned, responded that after one year a person starts earning vacation time.

The two General Electric vacation policies offered (1995 to 1998 and 1998 to 2001) were the same or similar in certain respects and, thus, only the differences are detailed below. The second vacation policy, contained in the employee handbook effective January 1, 1998, to January 1, 2001, provided:

"You are eligible for paid vacation if you are a full-time Company employee and have at least one year of continuous service.

* * *

_____

[3]General Electric apparently had a different vacation eligibility policy for its managers, such as Shires. In other words, managers were eligible after six months versus the one-year period for regular employees.

To remain eligible for vacation each year:

You must work at least part of the last full calendar week of the prior year or have earnings attributable to that week, and

Your continuous services or service credits must be maintained through December 31 of the prior year.

\* \* \*

In general, vacation pay is based on your normal straight-time earnings for a regular work week. \*\*\*

\* \* \*

If you are an eligible full-time Company employee, the amount of vacation you may take depends on the length of your continuous service. You become eligible for additional vacation weeks on your anniversary date, no matter when it falls during the year."

In a later paragraph, the policy stated that employees were "expected to schedule and take [their] full vacation each year," and that if an employee leaves the company, he or she (or his or her estate) "will be paid for any unused vacation days."

Conversely, the first policy, effective January 1, 1995, to January 1, 1998, stated, with respect to eligibility:

"If you are a new employee, you are eligible to *earn* vacation benefits once you have completed at least one year of continuous service with the Company. You receive additional weeks of vacation as the length of your continuous service increases." (Emphasis added.)

With respect to the length of vacation, the first policy provided:

"After you have completed one year of continuous service, you are entitled to one week of vacation. You are entitled to additional weeks of vacation when you pass certain service anniversaries, as shown below. You do not begin *earning* vacation benefits until you have completed one year of continuous service." (Emphasis added.)

Lastly, with respect to remaining eligible for vacation benefits, the first policy stated, "To remain eligible *to earn* vacation benefits each year," and thereafter continued the same as the second policy. (Emphasis added.) The service anniversaries under both policies were 1, 2, 5, 7, 15, 20, and 30 years.

On April 25, 2002, the Department filed its response to General Electric's motion for summary judgment, as well as a cross-motion for summary judgment, arguing that General Electric's vacation policy was an "earn-in-arrears" policy, *i.e.*, an employee works one year to earn vacation for the next year. The Department further argued that General Electric had failed to demonstrate that its policy was not a subterfuge to avoid paying vacation time, stating that numerous factors supported a conclusion that General Electric's employees earned vacation one year for the next year.

In addition to the above-referenced depositions and handbooks submitted by General Electric, the Department attached a December 14, 1993, memorandum from General Electric's corporate headquarters to its response. This memorandum was entitled "Prorated Vacation Pay for Illinois Employees," and provided that those employees who terminated their service during the year must be paid unused vacation. The memorandum further provided that in addition to those days, an employee who terminated his or her employment and would be entitled to additional vacation on their next anniversary date, would be entitled to a portion of that additional time. The memorandum set forth several examples. First, if an employee was to reach his fifteenth anniversary on September 16, 1994, and was terminated on June 18, 1994, the employee would be entitled to $9/12$ of the additional five days he or she would have earned September 16, and any remaining vacation days from 1994. Second, if the same employee terminated service with General Electric on December 17, 1993, he or she would be entitled to $3/12$ of the additional five days and any remaining days from 1993. With respect to employees who had worked for General Electric for less than one year, the memorandum provided that these employees must now be paid for the earned portion of their vacation. For example, if an employee was terminated after eight months, he or she would be entitled to $8/12$ of the 5 days he or she would have been eligible to take upon his or her one-year anniversary date.

On June 20, General Electric filed its reply and on September 19 the parties entered a joint stipulation that summary judgment was the most appropriate procedure to dispose of this case. On October 3, the trial court entered summary judgment in favor of General Electric. This appeal followed.

## ANALYSIS

■ Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2000); *Robidoux*, 201 Ill. 2d at 335. The right to relief must so clearly favor the movant that no fair-minded person could dispute the movant's right to judgment in its favor. *The Southern Illinoisan v. Department of Public Health*, 319 Ill. App. 3d 979, 986, 747 N.E.2d 401 (2001). In other words, the movant's entitlement to judgment must be clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986); *Turner Investors v. Pirkl*, 338 Ill. App. 3d 676, 681, 789 N.E.2d 323 (2003). The evidence must be strictly construed against the movant and liberally, or in the light most favor-

able, to the nonmoving party. *Turner Investors*, 338 Ill. App. 3d at 681. Where parties have filed cross-motions for summary judgment and have agreed that no genuine issue of material fact exists, a reviewing court decides the issues presented as questions of law. *Harwood v. McDonough*, 344 Ill. App. 3d 242, 245, 799 N.E.2d 859 (2003). With respect to a trial court's entry of summary judgment, our review is *de novo*. *General Casualty Co. of Illinois v. Carroll Tiling Service, Inc.*, 342 Ill. App. 3d 883, 889, 796 N.E.2d 702 (2003). "Our function on an appeal from the grant of summary judgment is limited to determining whether the trial court correctly found that no genuine issue of material fact existed and, if that was the case, whether the trial court correctly entered judgment as a matter of law." *General Casualty Co. of Illinois*, 342 Ill. App. 3d at 889.

■ Section 5 of the Wage Payment and Collection Act (Act) provides:

> "Every employer shall pay the final compensation of separated employees in full, at the time of separation ***.
>
> Unless otherwise provided in a collective bargaining agreement, whenever a contract of employment or employment policy provides for paid vacations, and an employee resigns or is terminated without having taken all vacation time earned in accordance with such contract of employment or employment policy, the monetary equivalent of all earned vacation shall be paid to him or her as part of his or her final compensation at his or her final rate of pay and no employment contract or employment policy shall provide for forfeiture of earned vacation time upon separation." 820 ILCS 115/5 (West 2002).

Also relevant in the instant case is the Department's regulation, entitled "Earned Vacations," which states as follows:

> "a) Whenever an employment contract or an employment policy provides for paid vacation earned by length of service, vacation time is earned pro rata as the employee renders service to the employer.
>
> b) Oral promises, handbooks, memoranda, and uniform patterns of practice may create a duty to pay the monetary equivalent of earned vacation.
>
> * * *
>
> f) The Department recognizes provisions whereby:
>
> 1) no vacation is earned during a limited period at the commencement of employment. The employer must demonstrate that the provision is not a subterfuge to avoid payment of vacation actually earned by length of service and, in fact, no vacation is implicitly earned or accrued during that period." 56 Ill. Adm. Code § 300.520 (2003).

The core of the dispute here is whether General Electric employees earn vacation days for prior work, *i.e.*, vacation time was compensation for the prior year's work, the Department's position, or, whether vacation days were given as an incentive for future work and were not compensation for past services, General Electric's position. In other words, the question is whether General Electric's policy provides for forfeiture of earned vacation time. The answer to this question, according to General Electric, is controlled by *Prettyman v. Commonwealth Edison Co.*, 273 Ill. App. 3d 1090, 653 N.E.2d 65 (1995). The Department, on the other hand, maintains that the facts of the instant case are more akin to those in *Golden Bear Family Restaurants, Inc. v. Murray*, 144 Ill. App. 3d 616, 494 N.E.2d 581 (1986), and *Mueller Co. v. Department of Labor*, 187 Ill. App. 3d 519, 543 N.E.2d 518 (1989).

Initially, we note that *Golden Bear Family Restaurants, Inc.* is not applicable, nor instructive, regarding the issues in the instant case and both counsel so agreed at a hearing on the summary judgment motions. The *Golden Bear Family Restaurants, Inc.* court concluded that the language of the vacation policies at issue clearly resulted in a forfeiture of earned vacation time and, because the policies resulted in forfeiture, they violated section 5 of the Act. *Golden Bear Restaurants, Inc.*, 144 Ill. App. 3d at 627. In the instant case, the language of the vacation policies is different from those in *Golden Bear Restaurants, Inc.* and does not clearly result in forfeiture.

In *Mueller*, an employee left his employer after working there for 1½ years. *Mueller*, 187 Ill. App. 3d at 520. Upon leaving, the employee sought to be reimbursed for vacation time that he had earned, but not taken, during the beginning of his second year of work. *Mueller*, 187 Ill. App. 3d at 520. The employer refused, stating that because the employee had not completed the fiscal year, he was not entitled to compensation for vacation time. *Mueller*, 187 Ill. App. 3d at 520-21. In *Mueller*, the vacation policy provided:

" 'INITIAL VACATION

After six months of service, new employees may take one-half of the vacation that they will have *earned* upon completion of their one-year anniversary. Then upon completion of one years [*sic*] service, the employee may take the other one-half of vacation *due*. ***

SUBSEQUENT VACATION

After the initial vacation, an employee becomes eligible for subsequent vacations at the beginning of each fiscal year. An exception to this is those years when vacation allotments advance. During these years, the employee will be allotted his regular vacation at the start of the fiscal year and the additional vacation on his anniversary date.

TERMINATION

Upon termination, the employee will be paid for any unused vacation for the current fiscal year.' " (Emphasis added and omitted.) *Mueller*, 187 Ill. App. 3d at 521-22.

The employer argued that its employment contract controlled over the Act and that its policy provided "that an employee became 'eligible' for vacation only with the beginning of each fiscal year," and because the employee in *Mueller* was not employed at the beginning of the fiscal year, since he had left the company before that time, he was not eligible for vacation benefits. *Mueller*, 187 Ill. App. 3d at 523. The *Mueller* court disagreed, finding that the "word 'eligible' as used in [the employer's] employment contract [did not] mean[ ] the same as 'earned' in the Act." *Mueller*, 187 Ill. App. 3d at 523. In this regard, the *Mueller* court stated:

"First, plaintiff's own vacation policy makes a distinction between when vacation time is earned and when an employee becomes eligible to take that time. The policy states an employee is entitled to two weeks of vacation during each of his first two years of employment. With additional years of service, the employee becomes eligible for additional vacation time. This additional vacation time becomes earned not at the beginning of the fiscal year but on the anniversary of the employee's hiring. This clearly indicates an employee does not become 'eligible' to take additional vacation time until he has 'earned' it by completing the necessary years of service. Under the reading of the employment contract urged by the plaintiff, an employee could 'earn' his vacation time only by being presently employed by the plaintiff on the first day of each fiscal year. Such a reading would require us to find an employee 'earns' his vacation benefits for a whole year on the basis of his employment status on a single day, not by his labors on the other 364. This result would defy the common understanding of the word 'earn' and we decline to adopt it." *Mueller*, 187 Ill. App. 3d at 523-24.

The *Mueller* court reversed the trial court's finding for the employer, concluding that the employee was entitled to *pro rata* vacation benefits. *Mueller*, 187 Ill. App. 3d at 524.

In *Prettyman*, the trial court granted summary judgment in favor of the defendant employer. *Prettyman*, 273 Ill. App. 3d at 1091. The employees appealed, contending that the defendant's vacation policy violated section 5 of the Act and that they were entitled to additional vacation pay. The policy at issue provided:

" '1. In each calendar year, all regular employees who were on the payroll and under age 70 at the close of the last day of the preceding calendar year shall be entitled to vacations with pay in accordance with the provisions of this Order.

2. A regular employee will be granted a regular vacation of two calendar weeks after completing the first year of service. However, a management employee will be eligible for a vacation of one calendar week after completing six months of continuous service, this vacation to be taken prior to the first year service anniversary date. Thereafter, a regular vacation of two calendar weeks in each calendar year will be allowed.

\* \* \*

11. A regular employee, eligible for a vacation with pay, whose employment by the Company is terminated before taking the entire vacation to which he or she is eligible during the current calendar year, shall receive a vacation allowance equal to his or her basic hourly rate for the number of eligible days in excess of the number of days of vacation already taken during the current calendar year \*\*\*.' " *Prettyman*, 273 Ill. App. 3d at 1091.

Under the policy, employees also received extra vacation days as the number of years of their service increased. *Prettyman*, 273 Ill. App. 3d at 1092. The trial court, in granting summary judgment in favor of the defendant, concluded that the policy did not "operate on an earn-in-arrears basis but [was] forward-looking in that defendant grant[ed] its employees their respective vacation allowances for a particular year on January 1 of that year." *Prettyman*, 273 Ill. App. 3d at 1092. The trial court further concluded that the defendant's vacation policy "did not require plaintiffs to forfeit any of their earned vacation benefits but, in fact, allowed them to keep all of the allotted vacation time for 1992 [the year of their termination] which they received on January 1 of that year \*\*\* despite the fact that they only worked for three-quarters of the year." *Prettyman*, 273 Ill. App. 3d at 1092.

On appeal, the plaintiffs contended that the trial court misconstrued the defendant's vacation policy. *Prettyman*, 273 Ill. App. 3d at 1092. The *Prettyman* court first set forth section 5 of the Act and noted that "an employer violates this provision only when it either fails to pay its former employees for their earned but unused vacation time or adopts a policy which provides that an employee loses earned but unused vacation time upon separation." *Prettyman*, 273 Ill. App. 3d at 1093. According to the plaintiffs in *Prettyman*, there was a material question of fact as to how and when the employees earned their vacation time. The *Prettyman* court disagreed, stating:

"Plaintiffs \*\*\* have failed to produce any exhibits, depositions, affidavits or other evidence which establishes that vacation time is earned in arrears, while defendant has presented evidence showing that employees are granted their vacation benefits in a given year before their services are rendered in that year. In addition to the

vacation policy, defendant has offered the affidavit and deposition testimony of George Mitchell, its director of compensation and benefit planning, which indicates that annual vacation benefits are, in fact, paid to employees before the company receives the benefit of their labor for a given year." (Emphasis omitted.) *Prettyman*, 273 Ill. App. 3d at 1093.

The *Prettyman* court then found that *Golden Bear Family Restaurants, Inc.*'s vacation policy was "wholly distinguishable." *Prettyman*, 273 Ill. App. 3d at 1093. Specifically, the *Prettyman* court stated:

"[T]he undisputed facts here show that [the plaintiffs] were not deprived of any earned vacation benefits but were, in fact, allowed to keep all of the 1992 vacation benefits given them on January 1 of that year despite having only worked for nine months of that year. As the foregoing discussion makes clear, the situation here differs from that in *Golden Bear* in that, here, no labor was yet rendered by plaintiffs at the time they were allotted their 1992 vacation benefits. Unlike in *Golden Bear*, where the vacation pay was considered compensation for past services, in this case, the vacation pay is conferred to the employees up front. Thus, it cannot be said that defendant's employees earn their vacation benefits on a *pro rata* basis." (Emphasis omitted.) *Prettyman*, 273 Ill. App. 3d at 1096.

According to the court, what the plaintiffs were really seeking was three-quarters of the vacation time they would receive the next year, which the defendant was not required to pay. *Prettyman*, 273 Ill. App. 3d at 1096. The court concluded:

"As defendant's vacation policy is not set up to confer vacation benefits as payment for past services but, rather, is essentially set up to confer such benefits as an inducement for future services, plaintiffs could never prevail on their claim that the policy violates section 5 of the Act by depriving them of their *pro rata* share of earned vacation time. Accordingly, we hold that summary judgment in favor of defendant was proper." (Emphasis omitted.) *Prettyman*, 273 Ill. App. 3d at 1096.

The holdings of *Prettyman* and *Mueller* clearly conflict despite the similarities of the policies, *i.e.*, the employees at each respective company received all of their vacation days at the beginning of the year, additional time was allotted only upon reaching the particular anniversary date, and eligibility was based upon working one specific day. We note that *Prettyman* did not even mention *Mueller*, yet reached a diametrically opposite conclusion, *i.e.*, because an employee was given all of his or her vacation days for the year on the first of the year, the policy was forward-looking, not an "earn in arrears" policy. Certain factors in both cases are present in the instant case that would allow General Electric's policy to fall into either. The case *sub*

*judice* is further complicated by the fact that there are two policies in the record that contain different language.[4] In addition, in the instant case, we have the December 14, 1993, memorandum from General Electric's corporate headquarters.[5]

The vacation policy set forth in General Electric's second handbook is analogous to the policy in *Prettyman* as demonstrated by the chart below. The *Prettyman* court set forth the following example[6]:

| Hire Date (no vacation) 12/1/93 | Six Months (1 week) 6/1/94 | 1-Year Anniversary (2 weeks) 12/1/94 | 1st day of New Calendar Year (2 weeks) 1/1/95 |

In the instant case, in the example we provide, which encompasses a longer period of time than the *Prettyman* example, the following situation would occur:

| Hire Date (no vacation) 12/1/93 | | 1-Year Anniversary (1 week) 12/1/94 | 1st day of New Calendar Year (1 week) 1/1/95 |

| 2-Year Anniversary (1 week) 12/1/95 | 1st day of New Calendar Year (2 weeks) 1/1/96 | 1st day of New Calendar Year (2 weeks) 1/1/97 | 1st day of New Calendar Year (2 weeks) 1/1/98 |

| 5-Year Anniversary (1/2 week) 12/1/98 | 1st day of New Calendar Year (2 1/2 weeks) 1/1/99 | | |

---

[4]Despite General Electric's employee's testimony that the policies meant the same thing and were administered the same way, the specific language of the policies is clearly different.

[5]Whether the Morrison plant followed or considered the statements in this memorandum to apply to it is irrelevant to the question of its meaning.

[6]This example is different from the case at bar because a management employee was involved in *Prettyman*, who was eligible for vacation time after six months. In addition, the length of the vacation was two weeks in *Prettyman*, not one week as here. Although General Electric apparently had a similar policy with respect to management, the employees involved in this case were eligible only after one year of work. These differences, however, are not relevant to our analysis.

In both the above situations, if the employee left the employer's company within six months (*Prettyman*) or one year in the instant case, he or she would not be entitled to any vacation. On the one year anniversary, both employees would be allotted vacation time, immediately, which they would be required to use within that very month. If the employee left the company during December 1994, he or she would be entitled to compensation for any of those days that remained unused. On January 1, 1995, both employees would be allotted vacation time to use throughout the balance of that year. Again, if the employee left the company at any time during the year, he or she would be entitled to compensation for any unused days. In our example, the employee would receive an additional week of vacation on December 1 because he or she would have reached the two-year anniversary. Again, the employee must use the vacation time within the next month, but if he or she left the company, he or she would be entitled to compensation for any unused time. The scenario would continue on in both instances. Clearly, under the vacation policy set forth in General Electric's employee handbook effective January 1, 1998, to January 1, 2001, the same situation exists here as in *Prettyman*. Moreover, the eligibility paragraph in General Electric's handbook, set forth above, is similar to the eligibility paragraph (paragraph 2) in *Prettyman*, *i.e.*, in *Prettyman*, working the last day of the year and, here, working at least some of the last week of the year. The policies are also the same in that additional vacation is awarded based on length of service and allotted upon reaching an anniversary date, vacations are expected to be taken in full each year, and, if an employee left the company, he or she would be paid for any unused vacation days from that year.

Accordingly, if the only relevant evidence in the instant case was the vacation policy set forth in the 1998 to 2001 handbook, *Prettyman* would be controlling. However, that is not the only relevant evidence in the instant case. We also have the policy set forth in the first employee handbook (effective 1995 to 1998). The language of the policy set forth in this handbook is more akin to *Mueller*. Specifically, this policy provided that an employee was "eligible to *earn*" vacation benefits once he or she had completed one year of service and that an employee "[did] not begin *earning* vacation benefits" until he or she completed that one year. (Emphasis added.) The policy in *Mueller* similarly provided that employees earned vacation upon completion of one year of service. Also, in both cases, employees received all of their vacation time at the beginning of the year (this was also the case in *Prettyman*) and employees could take additional vacation time, based on an anniversary, only upon reaching that an-

niversary. As in *Mueller*, General Electric's 1995 to 1998 policy used both the terms "eligible" and "earn" and, in fact, did so in the same sentence. As in *Mueller*, General Electric clearly could not have meant the terms to mean the same thing. Thus, if we looked only to the first vacation policy, we would have to say that *Mueller* controlled the outcome of the instant case.

The evidence presented here does not end there, however. We also must consider Wickler's testimony that he was never told that General Electric's vacation policy was forward-oriented and he stated that, after one year, a person begins earning vacation time. Most important, however, is the corporate memorandum, dated December 14, 1993, offered by the Department. Clearly, this memorandum demonstrates that employees earned vacation time. For example, an employee who left prior to reaching an anniversary date would be entitled to payment for the additional vacation time to be allotted upon reaching an anniversary date based on the number of months he or she worked that year before the anniversary date. Similarly, an employee who left before his or her first anniversary date would be entitled to the *pro rata* amount of vacation time for the number of months he or she worked. This plainly shows that employees earned vacation time based on their past service to General Electric.

We do not believe that *Prettyman* controls the outcome here. First, there was only one policy at issue in *Prettyman*, whereas here, we have two different policies as well as a corporate memorandum. In addition, *Prettyman* failed to address *Mueller*. Lastly, and most importantly, the court in *Prettyman* specifically stated that the plaintiffs had failed to adduce any evidence to show that the policy at issue was an "earn in arrears" policy. Conversely, in the instant case, we do have such evidence.

Thus, we must determine whether the trial court properly concluded that General Electric was entitled to judgment as a matter of law based on the evidence present in the record before this court. The Department maintains that General Electric failed to demonstrate that its policy was not a subterfuge. In this regard, General Electric maintains that *Prettyman* called into question the Department's regulation that requires the employer to prove its policy was not a subterfuge because *Prettyman* did not place the burden of proof on the employer to prove "the negative proposition that conferring vacation benefits up front is *not* a subterfuge for avoiding the payment of vacation actually earned by length of service." (Emphasis in original.) Alternatively, General Electric maintains that even if the regulation is valid, it has proven that no vacation time was *earned* (General Electric's own word) during the first year of work, which was not a subterfuge to avoid paying for vacation time.

With respect to General Electric's argument, we find it unpersuasive. First, General Electric improperly raises this substantive argument in a footnote. Substantive arguments may not be made in footnotes and responses made thereto are likewise improper. *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d 214, 218, 750 N.E.2d 314 (2001). In any event, we do not agree that *Prettyman* called this regulation into question. *Prettyman* did not even mention the regulation. Moreover, the *Prettyman* court did require the defendant employer to present evidence. This is particularly clear in light of its comment that the plaintiffs failed to produce any evidence and the court then recited the evidence presented by the defendant. In addition, the issue was before the court in *Prettyman* on the defendant's motion for summary judgment. No reported case has addressed the propriety of the Department's regulation and we do not believe the issue is ripe before this court. In any event, General Electric moved for summary judgment and was therefore required to demonstrate that it was entitled to judgment as a matter of law. The question is, then, whether General Electric demonstrated, as a matter of law, that its policy complied with section 5 of the Act. We find that it did not.

■ Unlike the plaintiff in *Prettyman*, the Department here presented ample evidence to establish that General Electric's vacation policy was an earn-in-arrears policy. The following evidence was adduced: the vacation policy effective 1995 to 1998; Shire's statement in his "Declaration" that employees did not "earn" vacation until after one year of service; Wickler's testimony that he, as General Electric's human resource specialist, was never told that the vacation policy was future-oriented and his testimony that after one year an employee began "earning" vacation time; and Hogue and Scott's testimony that they were under the impression that employees work one year for vacation time for the next year. The only evidence General Electric presented to demonstrate that its policy was forward looking was the second vacation policy, effective 1998 to 2001, which it interpreted pursuant to *Prettyman*. Because not only the weight of the evidence, but also viewing it in the light most favorable to the Department, demonstrates that General Electric's vacation policy did, in fact, confer vacation benefits as payment for past services, rather than as an inducement for future services, the policy, as in *Mueller*, violates section 5 of the Act. The evidence here, unlike that in *Prettyman*, does not so clearly and freely from doubt demonstrate that General Electric was entitled to relief and fair-minded persons could dispute its right to judgment as a matter of law. Accordingly, we find that the trial court erred in

entering summary judgment in General Electric's favor and against the Department. Based on the evidence presented, the trial court should have entered summary judgment on the Department's cross-motion in its favor. We therefore remand this cause to the circuit court for entry of summary judgment in the Department's favor in the amount of the wage payment demands made upon General Electric on behalf of Hogue and Scott and for a determination of the amount of penalty owed by General Electric to Hogue and Scott pursuant to section 14(b) of the Wage Payment and Collection Act (820 ILCS 115/14(b) (West 2002)).

## CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court of Cook County and remand this cause for further proceedings consistent with this order.

Reversed and remanded.

CAHILL and GARCIA, JJ., concur.