THIRD DIVISION
June 13, 2007

No. 1-05-3133

| | | |
|---|---|---|
| CONNIE MIKOLAJCZYK, Individually and as Special Administrator of the Estate of James Mikolajczyk, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 00L3342 |
| FORD MOTOR COMPANY and MAZDA MOTOR CORPORATION, | ) ) ) ) | The Honorable |
| Defendants-Appellants | ) ) | James P. Flannery, Jr., Judge Presiding. |
| (William D. Timberlake, | ) ) | |
| Defendant). | ) | |

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Connie Mikolajczyk, individually and as special administrator of the estate of her deceased husband James Mikolajczyk (hereinafter referred to as James), brought suit alleging strict products liability for a defective design against defendants Ford Motor Company and Mazda Motor Corporation (hereinafter referred to as defendants) and negligence against defendant William D. Timberlake (hereinafter referred to as Timberlake). James died when his Ford Escort was hit from behind by Timberlake's car. Summary judgment was entered against Timberlake and the case proceeded to a jury trial on the strict products liability claim. The jury found Timberlake 60% responsible for causing James's death and defendants 40% responsible. The jury awarded plaintiff $2 million for loss of money, goods and services and $25 million for loss of society and sexual relations. On appeal, defendants contended (1) that the trial court erred

1-05-3133

in instructing the jury on the law of strict liability for design defects; (2) that the trial court erred in declining to instruct the jury about damage apportionment, the effect of Timberlake's intoxication and the concept of sole proximate cause; (3) that the trial court erred in admitting emotional, prejudicial hearsay evidence about other accidents; (4) that the jury's verdict was arbitrary and excessive; (5) that the cumulative effect of the trial court's errors requires a new trial; and (6) that section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2004)) is unconstitutional. In Mikolajczyk v. Ford Motor Co., 369 Ill. App. 3d 78 (2006), we affirmed the judgment of the trial court in part and reversed in part, finding that the loss of society award of $25 million was excessive. Thereafter, the supreme court denied defendants' petition for leave to appeal, but pursuant to its supervisory authority, directed us to vacate our judgment and reconsider this case in light of its recent decision in Calles v. Scripto-Tokai Corp., No. 101089 (February 16, 2007). Mikolajczyk v. Ford Motor Co., 223 Ill. 2d 638 (2007). After vacating our original opinion and reconsidering our judgment in light of Calles, we again affirm in part, reverse the judgment regarding the $25 million loss of society award and remand to the trial court so that it may set a remittitur of the loss of society award.

The trial in this case took place over a period of 2 1/2 weeks. Numerous lay and expert witnesses testified. The parties do not dispute the facts concerning the accident or the extent of James's injuries. Instead, as stated above, they dispute the propriety of the given instructions, the court's admission of certain evidence, the amount of the award and the constitutionality of a statutory provision. Therefore, we set out only those facts necessary for our discussion of the issues raised.

At 8 p.m. on February 4, 2000, James was stopped at a stoplight, sitting in the driver's seat of his 1996 Ford Escort. His daughter Elizabeth was seated behind him in the back driver's side seat asleep. James and Elizabeth were both wearing their safety belts. Timberlake, traveling at speeds upwards of 60 miles per hour, crashed into the right rear of the Escort, causing it to spin into the intersection and collide with a van. Timberlake was intoxicated at the time of the accident.

Upon impact, James's seat flattened backwards, or "ramped" backwards, and he was ejected toward the rear of the car. James's head struck the back seat of the car and Elizabeth's legs were injured by the flattened front seat. James suffered brain damage from the impact. Because his prognosis was hopeless, James's life support was terminated and he passed away on February 7, 2000.

Plaintiff filed suit against defendants for strict products liability, alleging that James's car seat was defectively designed with inadequate strength making it unreasonably dangerous, and against Timberlake for negligence. Summary judgment was entered in plaintiff's favor against Timberlake and the case proceeded to trial on plaintiff's products liability claim, for a determination of whether the seat was defectively designed, whether the design proximately caused James's injuries, the relative responsibility of defendants and Timberlake and for an assessment of damages.

At trial, the following facts were adduced. The driver's seat of James's Escort was co-designed by defendants and was known as a CT20 seat. The CT20 seat was a "yielding seat," meaning that when force was applied to it, it yielded in the direction of the force, in effect,

absorbing some of the shock from an impact. The CT20 exceeded federal safety requirements. However, plaintiff's expert testified that compliance with the standard does not make a seat safe while defendants' expert testified that Ford does not look to the standard for advice concerning how to design a seat. In the alternative, what is known as a "rigid seat" was also available. In a rear impact accident, a rigid seat transfers the energy of the collision in the opposite direction of the collision, so that, upon impact, the passenger is thrown forward. When James's yielding seat ramped backwards during his accident with Timberlake, it performed according to its design.

Plaintiff's experts, including engineer L. Morrie Shaw, biomechanics expert Joseph Burton and seat design expert Kenneth Saczalski, testified that the yielding seat design proximately caused James's death and that the use of a rigid seat design was entirely feasible, would have protected James from his fatal injuries, would have better protected a backseat passenger and should have been utilized. Burton and Saczalski explained that the forces involved in James's accident were reasonably foreseeable by defendants, noting that automakers conduct crash tests under circumstances similar to James's accident. Saczalski testified that rigid seat technology was developed in the 1960s, rigid seats were built in the 1970s and became commercially available in the 1980s. Burton further explained that when a yielding seat ramps back, the use of a seatbelt offers the passenger no protection. The ramping of a yielding seat permits a passenger to slide up the seat and leaves the passenger vulnerable to striking structures in the rear of his car. Burton further testified that he had investigated accidents involving half of the speed involved in this accident in which the yielding seat had performed the same way James's had and had caused injury and death.

1-05-3133

Saczalski cited several examples of automobiles that were contemporaneous with the 1996 Escort that used rigid, rather than yielding, seat designs, including the 1996 Chrysler Sebring. Saczalski conducted a series of tests on the 1996 Escort, leaving the standard, yielding seat on the front driver's side and replacing the front passenger seat with a 1996 Sebring rigid seat and impacting the car from the rear at various speeds with various-sized dummies in the seats. From these tests, Saczalski concluded that rigid seats protect their occupants in high-speed, rear-impact accidents while yielding seats do not. More specifically, Saczalski found that the risk of severe to fatal head injury was 10 to 25 times greater with the yielding seat.

Plaintiff's experts admitted that a serious injury does not result every time a seat yields in a high-speed, rear-impact accident. They conceded that, if a passenger is not perfectly aligned in his seat at the time of an impact, a rigid seat can cause serious neck injuries and that, in a low-speed collision, an out-of-alignment passenger is actually safer in a yielding seat than in a rigid seat. They further agreed that very few cars that were on the market in 1996 met their specifications for a nondefective design.

Plaintiff's experts were permitted to testify, over defendants' objections, to three accidents that also occurred in Escorts and resulted in injuries and death to the passengers therein when the front seats of the Escorts ramped back on impact.

Defendants' experts, including Ford design engineer Roger Burnett, accident reconstruction expert Gregory Smith, research engineer Andrew Levitt, biomechanics experts Catherine Corrigan and Priyaranjan Prasad and Mazda engineer Shuji Kumano, testified that very few cars that were on the market at the time of James's car were equipped with rigid seats. In

designing the 1996 Escort seat, defendants considered all types of accidents, not just severe collisions as occurred to James. Defendants rejected the rigid seat design for safety reasons. The rigid design presents a serious risk of head and neck injuries even in a low-speed collision. On the other hand, a yielding seat presents little to no risk of neck injuries in a low-speed collision and a lower risk of neck injuries in all accidents. Moreover, a yielding seat better protects an out-of-position passenger from neck and spine injuries because it absorbs the impact of the accident and keeps the passenger's head and spine aligned and has a risk of causing severe injuries only in very high impact accidents, which are rare. Yielding seats also better protect back seat passengers who may be thrown into them during an accident. In fact, defendants' experts opined that Elizabeth would have been more severely injured had James's been a rigid seat. Defendants' experts testified that very few cars on the market at the time of James's Escort utilized rigid seat designs and that, because the Escort was a "high-volume vehicle," unlike the cars cited by plaintiff's experts as utilizing rigid seats, it was not possible for defendants to use a strong seat, like that used in a Sebring, in an Escort.

The surviving members of the Mikolajczyk family and friends of the family also testified. At the time of his death, James was 46 years old and was expected to live for 31.9 additional years. In 1999, James had earned $63,450 as a physician's assistant, a job he had held for 22 years. At the time of her husband's death and of trial, plaintiff worked as a secretary at a Catholic grade school. Plaintiff and James were married in 1980. In addition to Elizabeth, who was born in 1985, they had a son, Adam, who was born in 1980. Adam was 14 at the time of his father's death while Elizabeth was 10. Plaintiff and James's children testified that they frequently saw

them holding hands, dancing in the kitchen and singing to each other. The Mikolajczyk family cooked, cleaned, shopped and watched movies together.

Adam and his father were close. James coached and played baseball and basketball with Adam and inspired Adam's love of science. After James's death, Adam was very angry for months, breaking doors, punching his fist through the wall and crying daily. Adam was placed in counseling. Adam went on to graduate as the valedictorian of his high school class and to earn a scholarship from the University of Notre Dame.

Elizabeth and her father were "best friends." James sang Elizabeth to sleep every night. Since her father's death, Elizabeth is constantly afraid that something will happen to the surviving members of her family, often sleeping with her mother. Elizabeth's room is filled with pictures of her father.

In closing, plaintiff's attorney asked that the jury award plaintiff $2 million for loss of support and $25 million for loss of society. Defendants' attorney did not suggest a damages amount. Timberlake's attorney asked that the responsibility for the accident be divided 50% to his client and 50% to defendants.

The jury returned a verdict for $2 million in loss of support and $25 million in loss of society. By a special interrogatory, the jury found that the driver's seat of James's Escort was unreasonably dangerous and proximately caused James's death. Defendants' posttrial motions were denied and they appealed.

On appeal, defendants first take issue with the trial court's instructions regarding the law of design defect strict liability. The trial court read the jury the following modified Illinois

1-05-3133

Pattern Jury Instructions, Civil, Nos. 400.01, 400.02 and 400.06 (2005) (hereinafter IPI Civil (2005) Nos. 400.01, 400.02 and 400.06):

"The plaintiff claims that James Mikolajczyk died as a result of the use of his car and that there existed in the car at the time it left the control of Mazda Motor Corporation and Ford Motor Company a condition which made the car unreasonably dangerous in the following respects: The driver's seat was designed with inadequate strength.

The plaintiff further claims that the foregoing was a proximate cause of James Mikolajczyk's death.

Mazda Motor Corporation and Ford Motor Company deny that the claimed condition of the car made the car unreasonably dangerous and deny that any claimed condition of the car was a proximate cause of James Mikolajczyk's death.

Mazda Motor Corporation and Ford Motor Company deny that the plaintiff sustained damages to the extent claimed.

The plaintiff has the burden of proving each of the following propositions as to the condition claimed by the plaintiff.

First: That the condition claimed by the plaintiff as stated to you in these instructions existed in the car.

Second: That the condition made the car unreasonably dangerous.

Third: That the condition existed at the time the car left the control of the

-8-

defendant.

Fourth: That the plaintiff decedent was killed.

Fifth: That the condition of the car was a proximate cause of James Mikolajczyk's death.

***

When I use the expression, 'unreasonably dangerous,' in these instructions, I mean unsafe when put to a use that is reasonably foreseeable, considering the nature and function of the car."

The trial court refused to tender defendants' modified IPI Civil (2005) No. 400.01 and No. 400.02, which provided, in relevant part:

"Ford/Mazda further assert that on balance[,] the benefits of the 1996 Escort's front seat design outweigh the risks of danger inherent in the design."

And:

"If you find from your consideration of all the evidence that each [of the propositions enumerated above], then the burden shifts to Ford/Mazda to prove that on balance the benefits of the 1996 Escort's front seat design outweigh the risks of danger inherent in the design."

The trial court refused to tender defendants' requested non-IPI instructions:

"A product is defective in its design when the foreseeable risks of harm posed by the product outweigh the benefits of the design and the risks can be reduced or avoided by the adoption of an alternative feasible design. Feasible

alternative designs must be available at the time that the product left the control of the defendant.

Feasibility includes not only elements of economy, effectiveness and practicality, but also technological possibilities under the state of the manufacturing art at the time the product was produced."

The court also refused to tender defendants' requested non-IPI instructions:

"When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude. A product's design may be reasonably safe even if the product is not accident proof."

Defendants note that the effect of the court's instructions was that the jury was instructed on the "consumer expectations" test but was not instructed on the "risk-utility" test. Defendants acknowledge that, since 1990, a plaintiff has been required to prove a design defect either by the consumer expectations test or the risk-utility test. See Miller v. Rinker Boat Co., 352 Ill. App. 3d 648, 660-61 (2004). However, according to defendants, the Illinois Supreme Court adopted the risk-utility test as the exclusive test for design defects of complex products in Blue v. Environmental Engineering, Inc., 215 Ill. 2d 78 (2005), and held that the consumer expectations test is applicable only to simple products posing open and obvious dangers. Defendants contend that, because the jury was instructed on the inapplicable consumer expectations test, rather than

the risk-utility test, as requested by defendants, the jury was not apprised of the relevant legal principles. Furthermore, they argue that, should we determine that the court erred in instructing the jury on the consumer expectations test rather than the risk-utility test, a finding for the plaintiff under the risk-utility test would be against the manifest weight of the evidence and we should therefore reverse the jury's verdict outright. Alternatively, defendants ask that we reverse and remand this case for a new trial and proper instructions concerning the risk-utility test.

In response, plaintiff argues that any insinuation in Blue that the risk-utility test is the exclusive test to be used in strict liability cases involving complex products is *dicta*. Accordingly, plaintiff concludes, Blue does not affect the rule that a plaintiff may prove a strict liability design defect claim by either the consumer expectation test or the risk-utility test and the instructions correctly apprised the jury of the relevant legal principles. Plaintiff further notes that before Blue was decided, in a strict liability design defect case, this court found that a trial court that gave the jury instructions that are almost identical to those given in this case properly instructed the jury. See Carrillo v. Ford Motor Co., 325 Ill. App. 3d 955 (2001).

> "A trial court is required to use an Illinois Pattern Jury Instruction when it
> is applicable in a civil case after giving due consideration to the facts and the
> prevailing law, unless the court determines that the instruction does not accurately
> state the law. [Citations.] If the pattern instruction does not accurately state the
> law, the court may instruct the jury pursuant to a nonpattern instruction.
> [Citation.] The trial court has discretion to determine which instructions to give
> the jury and that determination will not be disturbed absent an abuse of that

discretion. [Citations.]  The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. [Citation.] A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant."  Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 273-74 (2002).

We begin our analysis of this issue with an overview of strict liability design defect law in Illinois.

A manufacturer bears a nondelegable duty to produce a product that is reasonably safe for all uses intended.  Hansen v. Baxter Healthcare Corp., 198 Ill. 2d 420, 433 (2002).  The principle of holding a manufacturer strictly liable for defective products was set forth in section 402A of the Second Restatement of Torts, which provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

-12-

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." Restatement (Second) of Torts § 402A, at 347-48 (1965).

Illinois courts have adopted the test articulated in section 402A of the Second Restatement of Torts and have applied it both to manufacturing defects and design defects. See Suvada v. White Motor Co., 32 Ill. 2d 612 (1965); Rios v. Niagara Machine & Tool Works, 59 Ill. 2d 79 (1974); Hunt v. Blasius, 74 Ill. 2d 203 (1978). The test set out in section 402A has come to be known as the consumer expectation test and has been articulated by the supreme court as follows:

"A product is 'unreasonably dangerous' when it is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " Lamkin v. Towner, 138 Ill. 2d 510, 528 (1990), quoting Palmer v. Avco Distributing Corp., 82 Ill. 2d 211, 216 (1980).

Illinois courts have also accepted what is known as the risk-utility or the risk-benefit test to prove that a product is unreasonably dangerous. See Hansen, 198 Ill. 2d at 433. Under the risk-utility test, a plaintiff "may demonstrate that a product is unreasonably dangerous because of a design defect by presenting evidence of an alternative design that would have prevented the

injury and was feasible in terms of cost, practicality and technological possibility." Hansen, 198 Ill. 2d at 436. Concerning the two tests, the supreme court has said:

> "A plaintiff may demonstrate that a product is defective in design, so as to subject a retailer and a manufacturer to strict liability for resulting injuries, *in one of two ways*: (1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeably manner *or* (2) by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs." (Emphasis added.) Lamkin, 138 Ill. 2d at 529.

Hansen, 198 Ill. 2d at 433. Accordingly, at least pre-Blue, a plaintiff could choose to prove its claim under only the consumer expectations test, only the risk-utility test, or under both. See Mele v. Howmedica, Inc., 348 Ill. App. 3d 1, 17 (2004) ("plaintiff sought to prove only that defendant's product failed to meet the ordinary consumer's expectations for the safety of the product. Although plaintiff, under the pleading, might also have sought to prove the design of the [product] unreasonably dangerous by showing its risks outweighed its benefits, he decided not to do so"); Miller, 352 Ill. App. 3d at 671 (summary judgment on the plaintiff's strict liability claim was improper when genuine issue of material fact existed under the risk-utility test or under the consumer expectations test). Moreover, pre-Blue, "Illinois courts have not limited the use of the consumer expectation test to cases in which everyday experience alone led to the conclusion the design was unsafe." Mele, 348 Ill. App. 3d at 19.

1-05-3133

Concerning the evidence necessary to prove a strict liability design defect claim, Illinois courts have held that the consumer expectations and risk-utility tests are not mutually exclusive and should be applied together.  Calles v. Scripto-Tokai Corp., 358 Ill. App. 3d 975, 979 (2005), *affirmed on other grounds*, Calles, No. 101089; Besse v. Deere & Co., 237 Ill. App. 3d 497, 501 (1992).  We have endorsed the practice of states which "consider the benefits and risks of a product's design as evidence of what a reasonable consumer should expect" and other states which use risk-benefit analysis but "allow evidence of consumer expectations–especially consumer anticipation of danger–for its relevance to the risks and benefits of the product's design."  Calles, 358 Ill. App. 3d at 979. Indeed, Illinois courts have taken "a position that accorded with courts that have viewed evidence of a product's risks and benefits as admissible evidence of what a reasonable consumer should expect from a product."  Mele, 348 Ill. App. 3d at 19.

Moreover,

"[t]he consumer expectation test usually does not require any evidence of ordinary consumer expectations, because the finder of fact may rely on its own experiences to determine what an ordinary consumer would expect. *** 'Whether a product is unreasonably dangerous is a question of fact to be determined by the jury. *** "[T]he jury can draw their own reasonable conclusions as to the expectations of the ordinary consumer and the knowledge common in the community at large." ' "  Mele, 348 Ill. App. 3d at 14-15, quoting Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 235, 429 A.2d 486, 489 (1980), quoting Slepski v. Williams Ford,

-15-

Inc., 170 Conn. 18, 23, 364 A.2d 175, 178 (1975).

Having set out the state of strict liability design defect law in Illinois, pre-Blue, we now turn to a discussion of the Third Restatement of Torts and Justice Thomas's comments thereon in Blue.

In the Third Restatement of Torts, the American Law Institute (ALI) distinguished between manufacturing defects and design defects, recognizing that "[c]onsumer expectations as to proper product design or warning are typically more difficult to discern than in the case of a manufacturing defect." Restatement (Third) of Torts: Products Liability § 2, Comment a, at 16 (1998). Accordingly, "[s]ome sort of independent assessment of the advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary." Restatement (Third) of Torts § 2, Comment a, at 15-16 (1998). The ALI adopted section 2 of the Third Restatement of Torts, which distinguishes between manufacturing defects, design defects and failures to warn. Section 2 provides:

> "A product is defective when, at the time of sale or distribution, it contains
> a manufacturing defect, is defective in design, or is defective because of
> inadequate instructions or warnings. A product:
>
> > (a) contains a manufacturing defect when the product departs from
> > its intended design even though all possible care was exercised in the preparation
> > and marketing of the product;
>
> > (b) is defective in design when the foreseeable risks of harm posed
> > by the product could have been reduced or avoided by the adoption of a

reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe."

Restatement (Third) of Torts: Products Liability § 2, at 14 (1998).

The ALI commented that, put another way, in order to prove a design defect, a plaintiff must prove that "a reasonable alternative design would, at reasonable cost, have reduced the foreseeable risks of harm posed by the product and [that] the omission of the alternative design by the seller or a predecessor in the distributive chain rendered the product not reasonably safe" (Restatement (Third) of Torts: Products Liability § 2, Comment *d*, at 19 (1998)), and that "[t]he relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered" (Restatement (Third) of Torts: Products Liabilty § 2, Comment *f*, at 23 (1998)). However, the ALI noted, "[t]his Restatement takes no position regarding the specifics of how a jury should be instructed. So long as jury instructions are generally consistent with the rule of law set forth in Subsection (b), their specific form and content are matters of local law." Restatement (Third) of Torts: Products Liability § 2, Comment *f*, at 25 (1998).

The ALI specifically rejected the consumer expectation test for design defects, commenting that "[u]nder Subsection (b), consumer expectations do not constitute an independent standard for judging the defectiveness of product designs"; however, the ALI noted that consumer expectations "may substantially influence or even be ultimately determinative on risk-utility balancing in judging whether the omission of a proposed alternative design renders the product not reasonably safe." Restatement (Third) of Torts: Products Liability § 2, Comment *g*, at 27-28 (1998).

Section 2 of the Third Restatement of Torts was discussed at length in <u>Blue</u>. In <u>Blue</u>, the plaintiff was injured when he stuck his foot into a trash compactor designed and manufactured by the defendants. The plaintiff filed a complaint against the defendants under the theories of strict liability and negligent defective design. The strict liability claim was dismissed and the case proceeded to a jury trial on the issue of negligent design defect. The jury returned a general verdict against the defendants and found the plaintiff to be 32% contributorily negligent. The jury answered in the affirmative a special interrogatory asking whether the risk of injury in sticking a foot into a compactor was open and obvious. The trial court found that the verdict was inconsistent with the jury's answer to the special interrogatory, vacated the jury's verdict and entered judgment on the interrogatory for the defendants.

On appeal, the plaintiff argued that the interrogatory was improperly given and, alternatively, that the jury's response to the interrogatory was not inconsistent with the verdict. The appellate court found that the interrogatory was incorrectly given because it did not resolve an ultimate issue of fact. According to the appellate court, the risk-utility test applied to the

plaintiff's case, so that, the plaintiff having demonstrated that the design of the product proximately caused his injury, the burden shifted to the defendants to demonstrate that the benefits of the design outweigh its risks. The open and obvious nature of the risk, the appellate court held, was just one factor to consider in balancing the risks and benefits of the defendants' design. The appellate court reversed the judgment, reinstated the jury's verdict and remanded the cause for consideration of the parties' posttrial motions.

The defendant appealed to the supreme court, alleging that the trial court properly entered judgment on the special interrogatory. Justice Thomas penned the opinion of the court, joined by Justice Garman.

The court first turned its attention to the appellate court's reasoning, couching the issue before it as whether "the risk-utility analysis normally used in strict products liability cases is applicable to defective product design cases involving only a negligence theory of recovery." Blue, 215 Ill. 2d at 81. Though the case before the court was one concerning negligence, Justice Thomas noted that "Illinois cases considering a cause of action for defective products liability sounding in negligence rather than strict liability are rare, probably because it appears to plaintiffs that it is easier to prove the strict liability count." Blue, 215 Ill. 2d at 95. Accordingly, the court turned to the law of strict liability for design defects. The court acknowledged that Illinois had adopted two alternative tests, the consumer expectations test and the risk-utility test for proving a strict liability design defect case but noted that the ALI had recently recognized the inadequacy of the consumer expectations test to address defective product designs and had, accordingly, exclusively adopted the risk-utility test.

In assessing whether the risk-utility test applied to negligent design defect cases, as well as cases sounding in strict liability, the court noted that the difference between strict liability and negligence claims lies in the concept of fault. The court noted:

> "strict liability focuses on the product and only requires proof that the benefits of the challenged design do not outweigh the risk of danger inherent in such designs, that the alternative design would have prevented the injury, and that the alternative design was feasible in terms of cost, practicality and technology." Blue, Ill. 2d at 97.

On the contrary, negligence focuses on the defendant's conduct. Consequently, the court held, in a negligence defective design case, a plaintiff is obliged to demonstrate that either:

> "(1) the defendant deviated from the standard of care that other manufacturers in the industry followed at the time the product was designed, or (2) that the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity." Blue, 215 Ill. 2d at 96.

Moreover, in a negligence action, the court held, a plaintiff bears the burden of proving all elements of negligence and that burden does not shift to the defendant. The court held that, because a negligence action, unlike a strict liability action, focuses on the conduct of the manufacturer, rather than the product itself, contrary to the appellate court's finding, the risk-utility test utilized in strict liability defective design cases was not applicable to negligence design defect cases.

Turning to the facts of the case before it, the court observed that the plaintiff had not actually presented any evidence of the industry standard and therefore did not prove his negligence case. Nonetheless, the court noted that any claim by the defendants that the plaintiff had not presented evidence of the standard of care or had not proven a duty or that there was insufficient evidence to sustain the plaintiff's cause of action was "foreclosed at this point" because the defendants had not raised such allegations in their posttrial motion and did not argue such allegations on appeal. Blue, Ill. 2d at 100.

Next the court turned to the defendants' contention on appeal: that the trial court properly ordered judgment on the special interrogatory concerning the open and obvious nature of the danger. The court stated that, while under the Second Restatement of Torts, the fact that a danger presented by the design of a product is open and obvious is a defense to a strict liability design defect cause of action, "[a] strong majority of courts," including Illinois courts, and the Third Restatement of Torts "have now rejected the open and obvious doctrine as an absolute defense to a claim of design defect in strict liability cases not premised on the failure to warn." Blue, 215 Ill. 2d 103. Nonetheless, in Illinois, "even in strict liability cases where the risk-utility test is applied, the obvious danger of the product may still bar liability *as a matter of law* in *some* cases." (Emphases in original.) Blue, 215 Ill. 2d at 109. The court cited Scoby v. Vulcan-Hart Corp., 211 Ill. App. 3d 106 (1991), as such a case and noted that where the danger created by a product is obvious and the product itself is simple, a court is to apply only the consumer expectation test. Blue, 215 Ill. 2d at 109.

However, the court stated, in the context of negligent design defect cases, such as the case

before the court, the open and obvious nature of a danger does not bar recovery but may be considered as part of the duty analysis. Accordingly, because the open and obvious nature of the danger created by sticking a foot in a compactor is not an absolute bar to the plaintiff's recovery, "the interrogatory was improper, as it did not resolve an ultimate issue in the case and was not necessarily inconsistent." Blue, 215 Ill. 2d at 113.

Special concurrences were filed by Justice Freeman and Justice Fitzgerald, joined by Justice McMorrow. Justice Kilbride also wrote separately, concurring in part and dissenting in part, while Justice Karmeier did not take part in the decision.

Concerning the court's holding that the risk-utility test is not applicable to negligent design defect cases, Justice Fitzgerald wrote:

> "Because the majority determines that defendant has not properly challenged the
> duty determination, I believe it is unnecessary to decide whether the risk-utility
> test is applicable in determining a duty in a negligence design defect case. It is
> therefore *dicta*." Blue, 215 Ill. 2d at 116 (Fitzgerald, J., specially concurring,
> joined by McMorrow, C.J.).

Justice Fitzgerald further opined that the risk-utility test does, in fact, play a role in assessing whether a duty exists in a negligent design defect case.

Justice Kilbride agreed with the court's conclusion that the special interrogatory given to the jury was inappropriate because the jury's answer to the interrogatory could not have resolved the ultimate issue in the case. He further agreed that the risk-utility test does not apply in negligent design defect cases. However, Justice Kilbride dissented to the court's discussion of

the Scoby exception to the risk-utility test because, since the compactor was not a simple machine, such analysis was unnecessary.

Justice Freeman also specially concurred. Though he wished to concur with Justice Thomas's final judgment in the case, Justice Freeman sought to distance himself from Justice Thomas's reasoning and *dicta*. The present case, he explained, was one concerning a negligent product design defect. However, "[t]he majority opinion contains sweeping pronouncements effecting changes not only with respect to products liability cases based on a negligence theory but also products liability cases based upon strict liability." Blue, 215 Ill. 2d at 114 (Freeman, J., specially concurring). Justice Freeman agreed with Justice Fitzgerald that the case before the court was not an appropriate one in which to decide whether the risk-utility test applied to negligent design defect cases and with Justice Kilbride that the court's simple machines discussion was *dicta*. Justice Freeman noted that "only three members of this court support the conclusion, expressed in the majority opinion, that the risk-utility test does not apply in a negligence design defect case." Blue, 215 Ill. 2d at 114 (Freeman, J., specially concurring).

Defendants argue that the Blue opinion marks a change in Illinois law regarding strict liability design defect cases. Specifically, defendants note that Justice Thomas repeatedly cited the Third Restatement favorably and stated that to prove a strict liability design defect claim, a plaintiff must show the existence of a feasible alternative design and that the benefits of the allegedly defective design do not outweigh its risks. Defendants suggest that Justice Thomas's discussion of the Scoby exception implicitly limited the consumer expectations test to cases concerning the defective design of simple products posing open and obvious dangers.

Defendants further assert that, "[a]lthough several justices concurred based on the view that the discussion of whether the risk-utility analysis applies to negligent design defect cases was *dicta*, none of the justices questioned the Court's conclusion that section 2b of the Restatement (Third) correctly set forth the law in Illinois for strict liability design defect cases."

We disagree with defendants' construction of Blue. Blue concerned a negligent design defect case in which the ultimate determinative issue was whether the fact that a danger presented by the allegedly defective design was open and obvious danger was an absolute bar to the plaintiff's recovery so that a special interrogatory on the subject was appropriate. Though, under the standard created by the court, the plaintiff failed to prove his negligence case, because the defendants did not raise this issue, any objection to that error was foreclosed. Accordingly, the discussion of the issue was *dicta*. Moreover, Justice Thomas, in his discussion of the risk-utility test and the Third Restatement of Torts, never explicitly endorsed the Third Restatement or renounced the consumer expectations tests for anything other than simple products whose dangers are obvious, as defendants allege.

We further disagree with defendants' assertion that the discussion of the law of strict liability was binding and was not *dicta* because the concurring justices did not explicitly categorize it as such. On the contrary, Justices Freeman and Fitzgerald, joined by Justice McMorrow, clearly stated that the entire discussion regarding the applicability of the risk-utility test to negligent design defect cases was *dicta*. An integral part of that discussion was the court's analysis of the risk-utility rule as applied to strict liability cases and section 2(b) of the Third Restatement of Torts, which clearly concerns strict liability cases. As Justice Freeman noted,

only three members of the court supported the discussion regarding the risk-utility test.  See also Calles, 358 Ill. App. 3d at 982 ("Justice Thomas expounded at length on tort law concerning strict products liability, in a portion of his opinion the majority of the court considered *dicta*").  Furthermore, even if the concurring justices did not specifically denounce the court's strict liability discussion as *dicta*, we find that such discussion was clearly *dicta* because the case before the court did not concern the standards applicable to a strict liability design defect case and instead concerned a negligent design defect case and because the discussion of the risk-utility test, even in the context of negligent design defect cases, did not determine the outcome of the case.  See Rodriguez v. Sherriff's Merit Comm'n of Kane County, 218 Ill. 2d 342, 356 (2006) (finding a statement by the appellate court that was unnecessary to its holding to be *dicta*).  Accordingly, we find that the law of Illinois remains that a plaintiff may prove a strict liability design defect by *either* the consumer expectations test *or* the risk-utility test.

Our conclusion is bolstered by the supreme court's recent decision in Calles.  There, the court was called upon to consider the so-called Scoby exception.  The court found that "the open and obvious danger of a product does not create a *per se* bar to a manufacturer's liability, nor does it preclude application of the risk-utility test. *** We reject Scoby's adoption of a *per se* rule excepting simple products with open and obvious dangers from analysis under the risk-utility test."  Calles, No. 101089, slip op. at 8.  Of particular importance to this case was the supreme court's favorable citation to Lamkin and pronouncement that since, Lamkin, the court had continued to adhere to the holding that "a plaintiff may demonstrate a product has been defectively designed 'in one of two ways,' " with the risk-utility test or with the consumer

-25-

expectations test. <u>Calles</u>, No. 101089, slip op. at 3, 4.

Here, plaintiff chose to proceed under the consumer expectations test. The jury was fully instructed on consumer expectations law and was, in our view, fully instructed on the applicable law.

Though we have found that <u>Blue</u> does not change the law with regard to the standard required to prove a strict liability design defect claim, we believe that it is important to note that even if, as defendants suggest, <u>Blue</u> marked a change in Illinois law, it is doubtful that that change would be applied to this case. This point was conspicuously not raised by either party in its briefs.

The jury in this case returned its verdict on March 15, 2005. <u>Blue</u> was decided on April 7, 2005. A decision of our supreme court is generally applied retroactively to causes pending at the time the decision was announced. <u>Lannom v. Kosco</u>, 158 Ill. 2d 535, 538 (1994); <u>People v. Melka</u>, 319 Ill. App. 3d 431, 437 (2000). However, a supreme court decision will be applied prospectively only if the court expressly states that the decision is to be applied prospectively only or a later court declines to give the opinion retroactive effect with respect to the parties appearing before it. <u>Aleckson v. Village of Round Lake Park</u>, 176 Ill. 2d 82, 86 (1997). A later court may decide to apply a decision prospectively only if the decision overrules past precedent or decides an issue of first impression that was not clearly foreshadowed. <u>Bogseth v. Emanuel</u>, 166 Ill. 2d 507, 515 (1995). If either of those propositions is true, in determining whether to apply the decision retroactively or prospectively, the later court will also consider whether the purpose of the new rule will be retarded or promoted by retroactive or prospective application

1-05-3133

and whether retroactive or prospective application is mandated by a balance of the equities. Bogseth, 166 Ill. 2d at 515.

Though, having determined that Blue does not change the law, we need not undergo the above analysis, we note that if Blue had adopted section 2 of the Third Restatement of Torts and had limited the consumer expectations test to cases involving simple products posing obvious dangers, it would have arguably overruled Lamkin and Hansen. Moreover, if Blue were found to overrule those precedential cases, considering that the trial, at which plaintiff proceeded under a consumer expectations theory, had already been completed at the time that Blue was decided and that the jury had already been instructed and had already returned a verdict for plaintiff, it is not unlikely that a balance of the equities would result in a finding that the new rule announced in Blue should be applied prospectively only, at least with regards to these parties.

We further reject defendants' argument that the trial court erred in denying their suggested instructions regarding the risk-utility test when it allowed testimony about the risks and benefits of the Escort's seat. As noted above, Illinois courts allow evidence of the risks and benefits of an allegedly defective product as evidence that it did not conform with consumer expectations. See, *e.g.*, Besse, 237 Ill. App. 3d at 501.

We also reject defendants' argument that the trial court erred in declining to instruct the jury on risk-utility rather than consumer expectations because no specific evidence of what a consumer would expect of his car seat was presented. As stated above, the consumer expectation test does not require specific evidence of consumer expectations when the jury can rely on its own experiences to draw its own reasonable conclusions regarding the expectations of an

-27-

ordinary consumer. <u>Mele</u>, 348 Ill. App. 3d at 14-15.

Finally, we observe that in their reply brief, defendants generally argue that the jury's verdict was against the manifest weight of the evidence. However, this issue was not raised in defendants' opening brief. On the contrary, in their opening brief, defendants' only well-developed argument in this regard was that, if the consumer expectations instructions were wrongly given and the court should have instead instructed the jury regarding the risk-utility test, the verdict was against the manifest weight of the evidence because the evidence did not show that the benefits of a yielding seat design were outweighed by its risks. We refuse to address any argument, raised for the first time in defendants' reply brief, that, even if the jury were correctly instructed on the consumer expectations test, under that test, the verdict was against the manifest weight of the evidence. See <u>People v. Brown</u>, 169 Ill. 2d 94, 108 (1995) (issue raised for first time in reply brief is waived).

Defendants next claim that the trial court committed prejudicial error in failing to tender the jury the apportionment instructions drafted by defendants.

Again, we note that we will not reverse on the grounds alleged by defendants unless we find that the trial court abused its discretion and

> "[t]he standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. [Citation.] A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." <u>Schultz</u>, 201 Ill. 2d at 273-74.

1-05-3133

Here, the court instructed the jury that Timberlake had been found responsible for James's death. It further instructed the jury, pursuant to a modified version of Illinois Pattern Jury Instructions, Civil, Nos. 600.02 and 600.02 (2005), that if it found that defendants were also legally responsible for proximately causing James's death, then it must apportion the damages "by determining the relative degree of responsibility of" defendants and Timberlake. The court further instructed the jury:

"On your verdict form you will state the percentage of responsibility of each of these defendants, treating Mazda Motor Corporation and Ford Motor Company as a single defendant.

The total of these percentages must add up to 100 percent."

However, the court refused to instruct the jury, as requested by defendants, that if it attributed to either defendants or Timberlake "less than 25% of the responsibility for proximately causing the death, that defendant will be required to pay only the percentage attributed that defendant of the total damage award" and that if it attributed to either defendants or Timberlake "25% or more of the total responsibility proximately causing the death," that defendant would be held jointly and severally liable, meaning that that defendant "could be required to pay 100% of the damages awarded, even if the percentage you attribute to that defendant is less than 100%."

After the jury rendered its verdict, three jurors signed affidavits swearing that they thought defendants would only be required to pay 40% of the total damages and that they would not have signed the verdict form had they known that defendants could be held joint and severally liable for the entire amount of the verdict. The trial court disregarded the affidavits.

-29-

We first note that the trial court properly disregarded the juror affidavits, which, defendants argue, demonstrate that the jury entered a "compromise verdict" with the intention that defendants pay only $10.8 million. Generally, a jury verdict cannot be impeached by a juror's testimony. People v. Hobley, 182 Ill. 2d 404, 457 (1998). "This rule prevents the admission of a juror's affidavit to show the 'motive, method or process by which the jury reached its verdict.' " Hobley, 182 Ill. 2d 457, quoting People v. Holmes, 69 Ill. 2d 507, 511 (1978). However, the general rule does not preclude the admission of juror affidavits "which are offered as proof of improper extraneous influences on the jury." Hobley, 182 Ill. 2d at 458. Here, the juror affidavits were offered to prove their motive in setting the amount of the verdict and in apportioning responsibility between defendants and Timberlake. Accordingly, the court was correct not to consider them.

Defendants do not cite any cases that stand for the proposition that their requested instruction on the effect of the law of joint and several liability was required. In fact, as Chief Justice McMorrow observed in her concurrence in Unzicker v. Kraft Food Ingredients Corp., 203 Ill. 2d 64, 104 (2002) (McMorrow, C.J., specially concurring), in cases such as this, "the jury is typically not instructed on the effect of joint and several liability." Furthermore, in response to the Unzicker defendant's allegation that the statute establishing the law of joint and several liability was unconstitutional, Justice McMorrow wrote that, while instructing a jury on the effect of joint and several liability would help avoid "compromise verdicts," "[w]hether compromise verdicts are a pervasive problem in the civil justice system has been seriously questioned." Unzicker, 203 Ill. 2d at 105 (McMorrow, C.J., specially concurring). Accordingly, we find that

the given instructions adequately outlined the procedure for apportioning fault between defendants and Timberlake and the court did not err in denying defendants' requested instruction.

Defendants next contend that the trial court committed prejudicial error in denying defendants' request that it instruct the jury pursuant to Illinois Pattern Jury Instructions, Civil, No. 12.01 (2005) (hereinafter IPI Civil (2005) No. 12.01) that it could consider Timberlake's intoxication in "determining his percentage of fault" and that "[a]n intoxicated person is held to the same standard of care as a sober person."

Plaintiff responds that the instruction was improper because summary judgment had already been entered against Timberlake. Therefore, whether he breached the standard of care or was at fault in bringing about James's death was a forgone conclusion. Instead of determining that issue, the jury was obliged only to assess the degree to which Timberlake was responsible for James's death. We agree with plaintiff's construction of the instruction.

We further agree with plaintiff that French v. City of Springfield, 5 Ill. App. 3d 368 (1972), the case cited by defendants in support of their contention that the court's failure to give the requested instruction on intoxication requires reversal, is distinguishable from the case at bar.

In French, the defendant argued at trial that the negligence of a nonparty intoxicated driver was the sole proximate cause of the plaintiff's injury. Evidence was presented at trial that the driver may have been drinking. Because the trial court did not instruct the jury pursuant to IPI Civil (2005) No. 12.01, the jury was not apprised of the effect of the driver's intoxication or his standard of care. Failure to instruct the jury on the standard of care to which the driver was held was reversible error. On the contrary, here, the court had already concluded that Timberlake

was negligent. Accordingly, the standard of care to which he was held was unimportant for the jury's purposes.

Defendant finally alleges that the trial court erred in denying their request that it instruct the jury pursuant to Illinois Pattern Jury Instructions, Civil, No. 12.04 (2005) (hereinafter IPI Civil (2005) No. 12.04), that if it decided "that the sole proximate cause of the death of James Mikolajczyk was the conduct of William Timberlake and not that of Ford/Mazda, then your verdict should be for Ford/Mazda."

The Notes on Use of IPI Civil (2005) No. 12.04 specifically state, "This instruction should be used only where negligence of a *person who is not a party to the suit* may have concurred or contributed to cause the occurrence." (Emphasis added.) IPI Civil (2005) No. 12.04, Notes on Use, at 58. Here, the court correctly denied the requested instruction because, though the issue of Timberlake's negligence had already been decided at the time of trial, Timberlake remained a party to the suit.

Defendants next contend that the trial court erred in permitting plaintiff's experts to testify to other accidents. Defendants argue that the other accidents were not substantially similar to James's accident and that the experts' testimony was hearsay, irrelevant, and prejudicial.

" 'The admission of evidence in a trial is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion.' [Citation.] An abuse of discretion exists where no reasonable person would agree with the position of the trial court." Brax v. Kennedy, 363 Ill. App. 3d 343, 355 (2005), quoting Skubak v. Lutheran General Health Care Systems, 339 Ill. App. 3d 30, 36 (2003). Evidence of prior accidents is generally admissible to show that the

product causing the accidents is dangerous and defective. Bass v. Cincinnati, Inc., 180 Ill. App. 3d 1076, 1080 (1989). However, in order to be admissible, the prior accident must have involved equipment that was in substantially the same condition as that involved in the accident in question and the accidents themselves must be substantially similar. Bass, 180 Ill. App. 3d at 1079; Gowler v. Ferrell-Ross Co., 206 Ill. App. 3d 194, 202 (1990). It need not be shown that the prior accidents occurred in an identical manner to the accident in question, just that the accidents were substantially similar. Bass, 180 Ill. App. 3d at 1080; Gowler, 206 Ill. App. 3d at 202.

In this case, plaintiff presented evidence of three other accidents. In the first, the driver of a 1998 Escort, Yolanda Teters, was hit from behind while pulling out of a driveway. Her yielding seat ramped and her head struck the back seat of her car causing injuries that resulted in her death. In the second, the driver of a 1997 Escort, Betty Potter, lost control and hit a tree with the back of her car. Her yielding seat ramped and her head struck the back seat of her car causing injuries that resulted in her paralysis. In the third, the driver of a mid-1980s Escort, Cathy Bitters, was involved in a rear collision that caused her car to roll. Her yielding seat ramped and her head struck the back seat of her car causing injuries that resulted in her paralysis.

Defendants contend that these accidents are not substantially similar to the case at bar because the seats in the other accidents were not CT20 seats, as James's was, because the seats did not utilize the same seat belt system as James's did, because two of the other Escorts were four door sedans while James's was a two door and because the other accidents were not rear-end collisions occurring while the Escorts were stopped.

1-05-3133

While clearly James's accident was not identical to Teters's, Potter's or Bitters's accident, all involved the same alleged defect, a seat that was built with inadequate strength, and in each, that allegedly defective seat caused the accident victim's brain and spinal injuries. See Gowler, 206 Ill. App. 3d at 203 ("the cracking mill involved in each accident had the same design defect as did the cracking mill on which plaintiff was injured and the resulting injuries from the other cracking mills were similar to the injury incurred by plaintiff. Therefore, the trial court properly admitted evidence of subsequent accidents"). Moreover, all accidents involved an impact to the rear of the cars driven by the accident victims. Accordingly, we cannot say that the other accidents were so dissimilar that the trial court abused its discretion in admitting evidence concerning them.

We further find, contrary to defendants' contention, that the evidence was relevant and was not hearsay and that the admission of the evidence was not overly prejudicial. Curiously, plaintiff has failed to respond to these contentions.

First, defendants' contention that the experts' testimony was hearsay is waived. Though defendants objected to the admission of the evidence on the grounds that the accidents were not substantially similar, they did not raise hearsay as a basis for their objection. See Land & Lakes Co. v. Industrial Comm'n, 359 Ill. App. 3d 582, 596 (2005) (Donovan, J., specially concurring) ("[a] party is required to make specific objections to evidence, based on particular grounds, and the failure to do so results in a waiver of objections as to all other grounds not specified or relied on"); Barreto v. City of Waukegan, 133 Ill. App. 3d 119, 130 (1985).

Waiver aside, defendants' contention regarding hearsay fails. Hearsay is an out-of-court

-34-

statement presented for the truth of the matter it asserts that is dependent for its value on the credibility of an out-of-court declarant. Chapman v. Hubbard Woods Motors, Inc., 351 Ill. App. 3d 99, 106 (2004).

First, the experts testified to the results of their investigations of the other accidents. Though they were not at the scenes of the accidents, they had personal knowledge of what took place pursuant to their investigations of those accidents; their testimony reflected their investigations, rather than the statement of an out-of-court declarant. Moreover, even if the experts' statements were not based on their personal observations, they are not inadmissible hearsay because they were not presented for the truth of the matter they asserted. The experts' testimony asserted that Teters, Potter and Bitters were injured when their cars were struck from the rear and their seats ramped. However, the testimony was presented to rebut defendants' assertion that accidents such as James's were very rare, to show that the design of James's seat was dangerous and to show that the seat's performance in James's accident was reasonably foreseeable to defendants.

We further find that the testimony was relevant and was not overly prejudicial. As stated above, the testimony regarding other similar accidents was relevant to show that James's seat was unreasonably dangerous and that the seat would ramp and cause his fatal injuries was reasonably foreseeable to defendants. Furthermore, we cannot say that the probative value of the evidence was outweighed by its prejudicial impact, particularly in light of the fact that the experts' testimony on the subject of other accidents was brief.

Notably, in a footnote, defendants observe that plaintiff's experts were also permitted,

over defendants' objection, to testify regarding the performance of rigid seats in police vehicles. However, defendants do not develop an argument that the court erred in admitting that evidence, only suggesting that its admission, coupled with the admission of testimony regarding Teters's, Potter's and Bitters's accidents, was prejudicial and denied defendants a fair trial, and do not cite authority in support thereof. Accordingly, we refuse to address this contention. See Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(a), eff. October 1, 2001 (noting that footnotes are discouraged); Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(h)(7), eff. October 1, 2001 (requiring that an appellant's brief include citations to the authorities and pages of the record relied upon); People ex rel. Department of Labor v. General Electric Co., 347 Ill. App. 3d 72, 87 (2004) ("[s]ubstantive arguments may not be made in footnotes and responses made thereto are likewise improper"); In re Marriage of Suriano, 324 Ill. App. 3d 839, 851 (2001) (lack of citation to legal authority results in waiver of an appellant's contention).

Defendants next contend that the jury's $25 million verdict for loss of society is arbitrary and excessive. They ask that we, therefore, vacate the judgment of the trial court and remand for a new trial, or, in the alternative, that we order remittitur to reduce the amount of the loss of society award.

> "The determination of damages is a question reserved to the trier of fact, and a
> reviewing court will not lightly substitute its opinion for the judgment rendered in
> the trial court. [Citations.] An award of damages will be deemed excessive if it
> falls outside the range of fair and reasonable compensation or results from passion

1-05-3133

or prejudice, or if it is so large that it shocks the judicial conscience." Richardson

v. Chapman, 175 Ill. 2d 98, 113 (1997).

Defendants argue that the loss of society verdict was excessive because "[n]o Illinois

court has ever upheld an eight-figure loss of society award. Nor is there some unusual evidentiary

basis that could justify an eight-figure award in this case." Defendants cite several Illinois cases

in which the juries awarded lesser loss of society awards than was awarded here in support of

their argument. See, e.g., Jones v. Chicago Osteopathic Hospital, 316 Ill. App. 3d 1121 (2000)

(upholding a $2.2 million loss of society award).

Plaintiff urges us not to compare the verdict amount in this case to other cases, arguing

that such a comparison is not authorized under Illinois case law. Plaintiff points out that, should

we determine that comparison is appropriate, several courts have upheld noneconomic awards to

accident survivors in the tens of millions. See, e.g., Richardson, 175 Ill. 2d 98 (upholding an

award of $3.5 million for disability, $2.1 million for disfigurement and $4.6 million for pain and

suffering, for a total noneconomic award of $10.2 million); Barton v. Chicago & North Western

Transportation Co., 325 Ill. App. 3d 1005 (2001) (upholding an award of $9 million for

disability, $8 million for disfigurement, $8 million for pain and suffering and $3 million for

future pain and suffering, for a total noneconomic award of $28 million).

This issue was recently addressed in Velarde v. Illinois Central R.R. Co., 354 Ill. App. 3d

523 (2004). The Velarde court cited Richardson, in which the supreme court refused to engage

in comparison of verdicts and noted that Illinois courts have traditionally declined to make

comparisons when determining whether an award is excessive, and Tierney v. Community

Memorial General Hospital, 268 Ill. App. 3d 1050 (1994), in which the court stated that it is simply not the law in Illinois to compare a jury's verdict to other similar awards. The Velarde court examined Johnson v. May, 223 Ill. App. 3d 477 (1992), a case cited by the Velarde defendants and the defendants in this case in support of a comparison of awards. The court noted that the Johnson court only made passing reference to the jury award in another case in support of its conclusion that a judgment for the defendants was contrary to the weight of the evidence. Specifically, the Johnson court stated:

> "The reported case law shows that persons afflicted with posttraumatic stress
> disorder arising from accidents comparable in severity to [the plaintiff's] have
> received as much as a half a million dollars in noneconomic damages from the
> negligent party. While the magnitude of that award is *scarcely controlling in*
> *other cases*, we think that it is at least some indicia of just how far off the mark
> the jury's verdict was in this case." (Emphasis added.) Johnson, 223 Ill. App. 3d
> at 488.

The Velarde refused to read "Johnson to mean that a bare comparison of dollar figures is an appropriate basis for deeming an award excessive" and declined "to depart from 'the clear weight of Illinois authority [which] reject[s] the "comparison" concept.' " Velarde, 354 Ill. App. 3d at 542, 543, quoting Tierney, 268 Ill. App. 3d at 1065.

We agree with Velarde's assessment of Illinois law and refuse to compare the amount awarded in this case to the amounts awarded in other cases in determining whether the verdict was excessive.

1-05-3133

Defendants further argue that the jury's $25 million loss of society award was "punitive, not compensatory." They note that the loss of society award, which they categorize as "punitive," is 12 1/2 times the amount of the award for loss of money, goods and services. Defendants cite State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 425, 155 L. Ed. 2d 585, 605-06, 123 S. Ct. 1513, 1524 (2003), in which the Court noted that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," and Heldenbrand v. Roadmaster Corp., 277 Ill. App. 3d 664, 674 (1996), in which this court noted that a punitive damage award of three times the compensatory damage amount is appropriate.

We agree with plaintiff's assessment of this argument that "[c]iting punitive damages decisions makes no sense." Although defendants contend that a loss of society award of $25 million must be punitive rather than compensatory, they do not develop this argument. Moreover, as plaintiff notes, punitive damages were not requested or authorized in this case. The $25 million loss of society award was pecuniary, not punitive. See Drews v. Gobel Freight Lines, Inc., 144 Ill. 2d 84, 92 (1991) (loss of society, companionship and conjugal relations are compensable pecuniary damages in a wrongful death suit). Accordingly, the three to one ratio applicable in assessing whether punitive damage amounts are excessive is inapplicable to this case.

Nonetheless, though we refuse to deem the loss of society award excessive merely because it was larger than loss of society awards in other cases, and though we refuse to regard the loss of society award as punitive, we cannot allow the $25 million loss of society award to

stand because it exceeds fair and reasonable compensation and shocks the judicial conscience.

The testimony presented at trial showed that the Mikolajczyk family was very close. They spent a great deal of time together. James was very affectionate with plaintiff. James was best friends with his daughter, coached his son's sports teams and engendered in his son a love of science. When James died, plaintiff was left to raise the children, who were 10 and 14 years old, alone. Since their father's death, both children have dealt with emotional problems. However, each has also gone on to be a successful student. In fact, Adam has gone on to earn a scholarship to Notre Dame.

In plaintiff's closing statement, plaintiff's attorney reiterated the testimony concerning the family's close relationship. Plaintiff's attorney then stated:

"When it comes down to it, I'm almost without the ability to give you a dollar value that makes sense for the loss of society. It's something that I have struggled with because I know it's your chore and it's uniquely your chore and it's one that the lawyers are free on both side[s] to make suggestions and I will.

I can't believe that a fair appraisal of the loss of society that these people have suffered would be less than $25 million. I can't believe it."

Though defendants' attorney did not suggest a damages amount, he reminded the jury:

"Under the law, under the law, you're required to find just and fair compensation and you have to be reasonable and fair.

Standing up here as [plaintiff's attorney] has done, he can ask for anything. It doesn't mean it's fair. It doesn't mean it's just. It doesn't mean it's reasonable.

1-05-3133

But that's for you to decide."

In their posttrial motion, defendants argued that the $25 million loss of society award was excessive. In refusing to grant a new trial on that basis or to remit the amount of the award, the trial court stated:

"Many plaintiffs' attorneys say that their plaintiffs are great plaintiffs and very sympathetic and good families and a good person. The jury's going to love the plaintiff. I hear that in basically every case.

In this case it was true. Mr. Mikolajczyk was a unique individual, a very wonderful person, and the family was very, very close, much closer than most of the families we have in court on a daily basis. The jury heard that."

We agree that the evidence presented at trial certainly revealed the close nature of the Mikolajczyk family's relationship and demonstrated that the loss suffered by the family when James died was enormous. The loss of a parent in any family relationship is catastrophic. Gone is the guidance one expects of a parent. Gone is the love and affection in such relationships. Gone is the intimacy so ever-present in a close family. Unfortunately, however, our system of justice does not have a formula to determine the fair amount of loss of society. Often the finder of fact relies more on the heart than the mind.

While we understand the jury's sympathy, we must disagree with the verdict and the trial court's assessment of that verdict and find that the $25 million loss of society award exceeds all fair and reasonable compensation and is so large as to shock the judicial conscience.

Turning now to the remedy for the excessive loss of society award, we note that

1-05-3133

defendants ask that we remand for an entirely new trial on damages or, in the alternative, order a remittitur of the award to $6 million, an amount equal to three times the loss of money, goods and services award.[1] Plaintiff responds that remittitur is not proper in this case.

> " 'The ordering of remittitur in lieu of wholly setting aside an excessive jury verdict, affirmance of which would be erroneous, has consistently been acknowledged to be promotive of the ends of justice and the termination of litigation.' [Citation.] 'The practice of ordering a remittitur of excessive damages has long been recognized and accepted as part of Illinois law.' [Citation.] Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 366(a)(5)) ***, specifically provides that a reviewing court has the power to grant any relief, including the entry of a remittitur. 'A remittitur is an agreement by the plaintiff to relinquish, or remit, to the defendant that portion of the jury's verdict which constitutes excessive

---

[1] In requesting a remittitur to $6 million, or three times the loss of money, goods and services award, defendants rely on the ratio commonly accepted in figuring punitive damages. See Heldenbrand, 277 Ill. App. 3d at 674. They also note that a $6 million loss of society award, coupled with the $2 million award for loss of money, goods and services, would put this case's award in line with awards arrived upon in other Illinois cases. See, *e.g.*, Barry v. Owens-Corning Fiberglas Corp., 282 Ill. App. 3d 199 (1996) (upholding a $6.85 million wrongful death award); Holston v. Sisters of the Third Order of St. Francis, 165 Ill. 2d 150 (1995) (upholding a $6.2 million wrongful death award); Drews, 144 Ill. 2d 84 (upholding a $8.3 million wrongful death award).

damages [citations] and to accept the sum which has been judicially determined to be properly recoverable damages [citation]. The only alternative to a remittitur in a case where the verdict exceeds the damages properly proven [citations], and/or where the verdict can be accounted on the sole basis that the jury acted from some improper motive [citation], such as passion or prejudice [citation], is for the trial judge to order a new trial [citations].' [Citation.] A court does not have the authority to reduce the damages by entry of a remittitur if plaintiff objects or does not consent. [Citation.] 'The trial court must afford the plaintiff the choice of agreeing or refusing to the entry of a remittitur, with the proviso that the plaintiff's refusal to agree to the entry of a remittitur will result in the ordering of a new trial.' " Peter J. Hartmann Co. v. Capitol Bank & Trust Co., 353 Ill. App. 3d 700, 711 (2004).

Haid v. Tingle, 219 Ill. App. 3d 406, 411-12 (1991); Best v. Taylor Machine Works, 179 Ill. 2d 367, 412-13 (1997); Tri-G, Inc. v. Burke, Bosselman & Weaver, Nos. 99584, 99595, slip op. at 24-25 (June 22, 2006).

We believe that, contrary to both parties' assertions, a remittitur rather than a new trial is proper in this case. Unlike in Bart v. Union Oil Co. of California, 185 Ill. App. 3d 64 (1989), in which a loss of consortium damage award was vacated and the case was remanded for a new damages trial because the evidence did not show that a loss of consortium award was warranted, here, there was sufficient evidence presented at trial to support a loss of society award. Moreover, unlike in Brown v. Arco Petroleum Products Co., 195 Ill. App. 3d 563 (1989), in

which a new trial was mandated not only by an excessive damages award but also by multiple trial errors that deprived the defendants of a fair trial, in this case, as discussed above, all of defendants' contentions of trial error were without merit.

As stated above, we find that the jury's loss of society award of $25 million to be excessive. See Richardson, 175 Ill. 2d at 115 (finding that a $100,000 award for pain and suffering, when the plaintiff suffered a laceration on her forehead, which healed with minimal scarring, and nightmares about her accident, was excessive and concluding that "a more appropriate figure for pain and suffering would be $50,000"); Johanek v. Ringsby Truck Lines, Inc., 157 Ill. App. 3d 140, 156-57 (1987) (finding, "[a]fter considering all of the evidence most favorably to [the plaintiff]," that an $880,000 award for loss of consortium, when the plaintiff's spouse was often "depressed and ornery" after his accident and when the plaintiff was often deprived of her spouse's companionship during his hospital stays, was excessive and that the plaintiff was "entitled to recover a sum not exceeding $500,000"). We, therefore, remand this case to the trial court for a hearing to determine the appropriate amount of remittitur. By way of guidance to the trial court, we would find it difficult to deem reasonable a loss of society award of more than seven figures in this case and would certainly find unreasonable an award of any more than one-half of the loss of society award settled upon by the jury. After the remittitur amount is set by the trial court, if plaintiff does not consent to the reduced award within a reasonable time period as set by the trial court, then the trial court shall order a new trial between the parties on the issue of the amount of loss of society damages.

Next, defendants contend that they were deprived of a fair trial by the cumulative effect

of the trial court's errors. Accordingly, they ask that we reverse the judgment of the trial court and remand for a new trial. However, having determined, as discussed above, that the trial court did not commit the errors alleged by defendants, we find this contention to be without merit.

Finally, defendants contend that section 2-1303 of the Code of Civil Procedure (735 ILCS 5/2-1303 (West 2004)), which provides that "[j]udgments recovered in any court shall draw interest at the rate of 9% per annum from the date of judgment until satisfied," is unconstitutional. The entirety of defendants' argument is as follows:

> "For the same reasons argued by Lakewood Electric Corporation in its appeal
>
> before this Court in [Schultz v. Lakewood Electric Corp., 362 Ill. App. 3d 716
>
> (2005), defendants] contend that [section 2-1303] is an unconstitutional violation
>
> of the due process and equal protection clauses of the federal and Illinois state
>
> constitutions."

Rule 341(e)(7) requires that an appellate brief contain an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefore, with citation of the authorities and the pages of the record relied on." Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001. Failure to comply with Rule 341(3)(7) generally results in a waiver of the issue. People v. Lantz, 186 Ill. 2d 243, 261-62 (1999).

In this case, defendants do not offer any argument or meaningful citation to authority in their brief. In fact, in support of their contention that section 2-1303 is unconstitutional they cite only a case which specifically held that section 2-1303 *is* constitutional. See Schultz, 362 Ill. App. 3d 716 (finding that section 2-1303 does not violate due process or equal protection).

1-05-3133

Accordingly, we find that they have waived this issue.

Waiver aside, though we are tempted to simply state, in response to defendants' argument, that for the reasons set forth in Schultz, we find that section 2-1303 does not violate the due process clause or the equal protection clause of the federal or Illinois constitution, we will indulge in a brief discussion of the constitutional arguments raised in Schultz, a case to which we adhere.

In Schultz, on remand from the defendant's unsuccessful appeal, the defendant was ordered to pay interest on the jury's verdict for the plaintiff. Defendant appealed, contending that section 2-1303 of the Code of Civil Procedure was "violative of due process and equal protection under article I, sections 2 (due process and equal protection clauses) and 12 (access to courts clause) of the Illinois Constitution and the fourteenth amendment (due process and equal protection clauses) to the United States Constitution." Schultz, 362 Ill. App. 3d at 719. Concerning its due process contention, the defendant argued that section 2-1303 contravened its access to the courts because the interest rate the statute set amounted to an arbitrary taking of property without a hearing and because the statute penalized a party for appealing. We declined to address the defendant's argument that the interest charge was an arbitrary taking because the defendant had offered no meaningful argument or citation in support of that contention. We found that the access to courts provision of the Illinois Constitution and the notion of access to courts embodied in the fourteenth amendment of the United States Constitution focused on fees required to file or maintain a suit to vindicate one's rights. Section 2-1303 did not concern such a fee. However, even if those provisions applied, because access to courts does not concern a

-46-

1-05-3133

fundamental due process right, and the award of interest serves the legislature's purpose of compensating a party whose money has been wrongfully withheld, the defendant's due process claim would fail.

Concerning its equal protection contention, the defendant argued that the statute treated it, a judgment debtor, disparately from judgment creditors because, for example, if the defendant had paid the plaintiff the amount of the judgment but the judgment had been reversed on appeal, the plaintiff would not have been obliged to pay the defendant interest. The defendant additionally argued that the statute treated it differently from all other parties to civil litigations where money judgments were not involved because those parties would not be required to pay interest. We held that the rational basis test applied and that, therefore, the question was "whether section 2-1303 places similarly situated persons into different classifications for reasons wholly unrelated to the purpose of the legislation." Schultz, 362 Ill. App. 3d at 728. We found that the defendant's argument regarding judgment creditors failed because, in its hypothetical, the plaintiff would become the judgment debtor under the statute and would therefore be obliged to pay interest. We declined to address the defendant's argument regarding other parties to civil litigations because the defendant had not argued that those parties were similarly situated to judgment debtors. Accordingly, we found that section 2-1303 did not violate the Illinois or the United States Constitutions as alleged by the defendant.

We find the reasoning of Schultz persuasive and therefore find no merit to defendants' contention that section 2-1303 of the Code of Civil Procedure violates constitutional notions of due process or equal protection.

-47-

For the above-state reasons, we affirm the judgment of the trial court in part, reverse the judgment of the trial court regarding the loss of society award and remand this case so that the trial court may set a remittitur of the loss of society award.

Affirmed in part and reversed in part; cause remanded.

JUSTICE CAMPBELL, specially concurring:

I agree with the majority's disposition of the case, but write separately to clarify two minor points. Our supreme court has held that an award of damages is excessive "if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." Richardson v. Chapman, 175 Ill. 2d 98, 113 (1997) (emphases added). Richardson states a disjunctive standard, any part of which may, if met, warrant the rejection of a verdict. Moreover, as the majority opinion notes, the clear weight of authority in Illinois declines to compare verdicts in this context. Velarde v. Illinois Central R.R. Co., 354 Ill. App. 3d 523, 542-43. But see House v. Stocker, 34 Ill. App. 3d 740, 751 (1975) (a comparative examination of verdicts in many cases involving similar injuries may be used for purpose of confirming the reliability of our own judicial conscience). The determination of the issue requires a case-by-case approach. For example, having authored the opinion in Barton v. Chicago & North Western Transportation Co., 325 Ill. App. 3d 1005 (2001), cited in the majority opinion, I note that the award was upheld because the defendants failed to provide an adequate record for review. Barton, 325 Ill. App. 3d at 1042-43.

In this case, even taking into account the evidence noted by the trial court in upholding the verdict, I conclude that the verdict falls outside the permissible range. The award does not

shock my judicial conscience, but Illinois law does not require such to join the majority opinion.

JUSTICE MURPHY, specially concurring:

I agree with Justice Greiman's disposition of this case. However, I write separately concerning the remand of this case to the trial court for a hearing to determine the appropriate amount of remittitur. As the majority and separate concurring opinion both note, Illinois courts have consistently declined to compare damages awarded in different cases to determine if an award is excessive. Velarde v. Illinois Central R.R. Co., 354 Ill. App. 3d 523, 543 (2004). As noted in Justice Campbell's concurrence, this issue is best determined on a case-by-case approach.

I agree that the award in this case is slightly excessive and that a hearing to set a remittitur amount better serves the interests of justice than a new trial or our setting an award. While I respect the guidance given by the majority, I would defer to the sound judgment of the trial court after the hearing rather than establishing an acceptable range. Great deference should be given to the findings and decision of the trial court in determining a proper award.